## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| PHEASANT RUN APARTMENTS, L.P., | ) | |
| | ) | Case No. 10-03060-AJM-11 |
| Debtor. | ) | The Honorable Anthony J. Metz III |
| | ) | |

## DEBTOR'S DISCLOSURE STATEMENT FOR ITS
## FIRST AMENDED PLAN OF REORGANIZATION

**Dated:   May 18, 2010**          **Submitted by:**

**STAHL COWEN CROWLEY ADDIS, LLC**
Scott N. Schreiber
Shelly A. DeRousse
55 West Monroe, Suite 1200
Chicago, Illinois  60603
(312) 377-7766

***Attorneys for the Debtor and Debtor-in-Possession***


**IMPORTANT:**

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN OF REORGANIZATION.  ACCORDINGLY, PLEASE READ THIS DOCUMENT WITH CARE.**

# TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................................4

  A.    **Purpose of This Document**.............................................................5

  B.    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**...............5

    1.    *Time and Place of the Hearing to Confirm the Plan*....................................5

    2.    *Deadline For Voting to Accept or Reject the Plan*....................................5

    3.    *Deadline For Objecting to the Confirmation of the Plan*.............................5

    4.    *Identity of Person to Contact for More Information*..................................6

  C.    **Disclaimer**...........................................................................6

II.   **BACKGROUND**..................................................................................6

  A.    **Description and History of the Debtor's Business**.....................................6

  B.    **Insiders of the Debtor**...............................................................6

  C.    **Management of the Debtor Before and During the Bankruptcy**...........................7

  D.    **Events Leading to Chapter 11 Filing**..................................................7

  E.    **Significant Events During the Bankruptcy Case**.......................................8

  F.    **Projected Recovery of Avoidable Transfers**...........................................8

  G.    **Claims Objections**...................................................................8

  H.    **Current and Historical Financial Conditions**........................................9

III.  **SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**.................................................................9

  A.    **What is the Purpose of the Plan of Reorganization?**..................................9

  B.    **Administrative and Priority Claims**.................................................9

    1.    *Administrative Expenses (Class 1)*....................................................9

    2.    *Unsecured Priority Claims (Class 2)*................................................10

    3.    *Priority Tax Claims (Class 3)*......................................................10

  C.    **Classes of Claims and Equity Interests**............................................10

    1.    *Class of Secured Claims (Class 4)*..................................................11

    2.    *Classes of General Unsecured Claims (Classes 5 and 6)*.............................11

    3.    *Class of Equity Interest Holders (Class 7)*........................................11

  D.    **Means of Implementing the Plan**....................................................12

  E.    **Risk Factors**......................................................................12

  F.    **Executory Contracts and Unexpired Leases**..........................................12

  G.    **Tax Consequences of Plan**..........................................................13

IV.   **CONFIRMATION REQUIREMENTS AND PROCEDURES**..................................13

    A.   **Who May Vote or Object**..................................................................13

        1.   *What Is an Allowed Claim or an Allowed Equity Interest?*...................................14

        2.   *What Is an Impaired Claim or Impaired Equity Interest?*......................................14

        3.   *Who is **Not** Entitled to Vote*..........................................................14

        4.   *Who Can Vote in More Than One Class*..................................................15

    B.   **Votes Necessary to Confirm the Plan**......................................................15

        1.   *Votes Necessary for a Class to Accept the Plan*...........................................15

        2.   *Treatment of Nonaccepting Classes*......................................................15

    C.   **Liquidation Analysis**....................................................................15

    D.   **Feasibility**.............................................................................15

        1.   *Ability to Initially Fund Plan*...........................................................16

        2.   *Ability to Make Future Plan Payments And Operate Without* Further *Reorganization*.........................................................................16

V.   **EFFECT OF CONFIRMATION OF PLAN**.........................................................16

    A.   **DISCHARGE OF DEBTOR**....................................................................16

    B.   **Modification of Plan**....................................................................16

    C.   **Final Decree**...........................................................................16

## I.    **INTRODUCTION**

This is the disclosure statement (the "**Disclosure Statement**") in the chapter 11 case of Pheasant Run Apartments, L.P. (the "**Debtor**" or "**Plan Proponent**").  This Disclosure Statement contains information about the Debtor and describes the First Amended Plan of Reorganization (the "**Plan**") filed by the Debtor on May 7, 2010.   A full copy of the Plan is attached to this Disclosure Statement as **Exhibit A.** *Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 8-11 of this Disclosure Statement.  Attached as Exhibits to this Disclosure Statement are copies of the following:

**Exhibit A-**  The Plan

**Exhibit B-**  Identity and Fair Market Value of Assets

**Exhibit C-**  Projected Cash Flow

**Exhibit D-**  List of Rejected Executory Contracts

**Exhibit E-**  Liquidation Analysis

### A.    **Purpose of This Document**

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "**Court**") will consider when deciding whether to confirm the Plan,
- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B.    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

This Disclosure Statement is being distributed by the Debtor to those creditors and holders of interests who are entitled to consider and vote on the Plan as set forth herein.  On _____, 2010, after notice and a hearing, the Court approved this Disclosure Statement as containing such information as would enable a hypothetical, reasonable investor typical of the holders of claims and

interests being solicited herein to make an adequately informed judgment in exercising such holder's right to vote either to accept or to reject the Plan.

The Court's approval of this or any other Disclosure Statement does not constitute a determination by the Court as to the merits of the Plan or whether any creditor or holder of an interest should vote to accept or reject the Plan. The Court has not yet confirmed the Plan. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

**THE DEBTOR BELIEVES THAT THE PLAN PROPOSED HEREIN IS IN THE BEST INTERESTS OF ITS CREDITORS AND HOLDERS OF INTERST. AS SUCH , THE DEBTOR STRONGLY URGES ALL CREDITORS AND HOLDERS OF INTEREST TO VOTE IN FAVOR OF THE PLAN.**

1.   *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, 2010, at [insert time], before the Honorable Judge Metz, in Courtroom 311, of the U.S. Bankruptcy Court, Indianapolis Division, 46 E. Ohio St., Indianapolis, Indiana 46204.

2.   *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to counsel for the Debtor at the following address:

> Stahl Cowen Crowley Addis, LLC
> Scott N. Schreiber
> Shelly A. DeRousse
> 55 W. Monroe Street, Suite 1200
> Chicago, IL 60603

See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by [insert date] or it will not be counted.

3.   *Deadline For Objecting to the Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon the following persons on or before [insert date]:

> Stahl Cowen Crowley Addis, LLC
> Scott N. Schreiber
> Shelly A. DeRousse
> 55 W. Monroe Street, Suite 1200
> Chicago, IL 60603
>
> Joseph F McGonigal
> Office of U.S. Trustee

101 W Ohio St Ste 1000
Indianapolis, IN 46204

4.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact counsel for the Debtor, Shelly A. DeRousse at Stahl Cowen Crowley Addis, LLC, 55 W. Monroe Street, Suite 1200, Chicago, IL 60603 or sderousse@stahlcowen.com.

C.      **Disclaimer**

*The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.*

II.     **BACKGROUND**

A.      **Description and History of the Debtor's Business**

The Debtor is a limited partnership. Since 2002, the Debtor has been in the business of operating a twenty-acre, 184 unit apartment complex (the "**Apartment Complex**").

B.      **Insiders of the Debtor**

The following are insiders of the Debtor, as defined in §101(31) of the United States Bankruptcy Code (the "**Code**"):

Alexander Housing II, Inc., General Partner of the Debtor

David Rasmussen, President of Alexander Housing II, Inc.

Alexander Companies LLC

Alexander Group, Inc.

During the two years prior to the Petition Date, the Debtor paid the following compensation to the insiders:

| Insider | Total Amount Paid | Reason for Payment |
|---------|-------------------|--------------------|
| Alexander Housing II, Inc. | $0.00 | [insert reason] |
| David Rasmussen | $0.00 | n/a |
| Alexander Companies LLC | $46,645.00 | Fees for managing the Debtor's operations. |
| Alexander Group, Inc. | $73,094.00 | Fees for managing the Debtor's |

| | | operations. |
|---|---|---|

During the pendency of this Chapter 11 case, the Debtor paid or will pay the following compensation to the insiders:

| Insider | Total Amount Paid | Reason for Payment |
|---|---|---|
| Alexander Housing II, Inc. | $0.00 | n/a |
| David Rasmussen | $0.00 | n/a |
| Alexander Companies LLC | $19,800.00 | To be paid pursuant to Section 3.1(b) of the Plan, in compensation for management services performed for the Debtor in the ordinary course of business since the Petition Date. |
| Alexander Group, Inc. | $0.00 | n/a |

C.    **Management of the Debtor Before and During the Bankruptcy**

During the two years prior to the date on which the bankruptcy petition was filed, managers or other persons in control of the Debtor (collectively the "**Managers**") were Alexander Companies LLC, Alexander Group, Inc., and S&I Onsite Management Incorporated.  Alexander Group, Inc. performed management services for the Debtor until April 10, 2009.  Thereafter, Alexander Companies LLC began to provide such services for the Debtor and continues to perform those management services.

Alexander Companies LLC and S&I Onsite Management Incorporated have also performed services for the Debtor during the Debtor's chapter 11 case.  S&I Onsite Management Incorporated is not related to the Debtor.  It has been compensated in the ordinary course of business, pursuant to an order of the Court.  The Debtor has deferred payment to Alexander Companies LLC, a company related to the Debtor, at the request of its secured lender Republic Bank and Trust ("**Republic Bank**").  However, Alexander Companies LLC will be compensated for services it performed during the pendency of the bankruptcy case upon confirmation of the Plan, along with all of the other administrative claimants.

After the effective date of the order confirming the Plan, the managers or other persons in control of the Debtor (collectively the "**Post Confirmation Managers**") will also be Alexander Companies LLC and S&I Onsite Management Incorporated.  The responsibilities and compensation of these Post Confirmation Managers are identical to the responsibilities and compensation they received prior to the filing of the bankruptcy case.

D.    **Events Leading to Chapter 11 Filing**

While the Apartment Complex has historically generated a positive cash flow in the ordinary course of business, recently it has been faced with some extraordinary expenses which it cannot pay, in full, from its liquid assets.

Specifically, the local real estate taxing authority, the Marion County Treasurer (the "**County**"), has informed the Debtor that it intends to collect two years worth of real estate taxes within the next annual tax cycle.  Through no fault of the Debtor, the County fell behind on sending out its real estate tax bills.  Now the County will seek full payment of both taxes which would have been due this year, as well as the taxes it delayed billing.  Since the main asset of the Debtor is real estate, these taxes are a huge burden on cash flow.

Also, on or about December 18, 2009, a judgment in the amount of $245,828.00 was entered against the Debtor in State Court in favor of Flaherty & Collins Construction, Inc. The Debtor has filed notice of appeal of that judgment and disputes the merits of the claim. Nevertheless, the judgment, coupled with the real estate taxes, render the Debtor in need of this Court's protection to restructure its obligations.

E.      **Significant Events During the Bankruptcy Case**

On March 10, 2010 (the **"Petition Date"**), the Debtor commenced this case under Chapter 11 the Bankruptcy Code. The Debtor continues to operate its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No creditors committee, trustee, examiner or ombudsperson has been appointed in this Chapter 11 case.

The Debtor filed four "First Day" motions shortly after the case was filed. The first was a Motion for Continuation of Utility Service and Approval of Adequate Assurance Payments to Utility Companies, which was granted by a final order entered by the Court on April 13, 2010. The final order requires the utility companies to continue to provide their respective utility services to the Debtor during the bankruptcy case, provided that the Debtor comply with certain protections in the final order.

The second was a Motion for Use of Cash Collateral which was granted by a final order entered by the Court on May 14, 2010. The final order allows the Debtor use its cash on hand and cash it receives during the bankruptcy case in the ordinary course of business and provides certain protections for Republic Bank, which has a security interest in that cash.

The third was a Motion for Approval of Cash Management System, which was granted on an interim basis, subject to the United States Trustee's authorization of Republic Bank to hold debtor-in-possession funds. Among other things, the interim order allows the Debtor to keep its funds in the same bank accounts it used before filing the bankruptcy case.

The fourth was a Motion for Authority to Pay Management Company in the Ordinary Course of Business, which was granted by a final order entered on March 19, 2010. The final order allows the Debtor to continue to pay S&I Onsite Management Incorporated in the ordinary course of business during the bankruptcy case.

On April 1, 2010, the Debtor filed an Application to Employ Stahl Cowen Crowley Addis LLC as its counsel in the bankruptcy case. No objections to that application were filed before the objection bar date. On May _____, 2010, the Court entered an Order granting that Application.

On April 21, 2010, the United States Trustee held a meeting of creditors pursuant to § 341 of the Bankruptcy Code.

F.      **Projected Recovery of Avoidable Transfers**

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

G.      **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving a disputed claim will be set by order of the Court if the Debtor files an objection.

H.    **Current and Historical Financial Conditions**

The identity and fair market value of the estate's assets are listed in **Exhibit B**. The Debtor obtained a valuation of the Apartment Complex from James P. Walsh, Senior Vice President/Investments of Marcus & Millichap.

The Debtor's projected budget and cash flow for approximately one year from the confirmation of the Plan is attached as **Exhibit C**. The Debtor plans to pay the payments due under the Plan from its net income earned in the ordinary course of business after the confirmation of the Plan.

III.    **SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

A.    **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.    **Administrative and Priority Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1.    *Administrative Expenses (Class 1)*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Proposed Treatment |
| --- | --- |
| All professional fees, as approved | Paid in full on the effective date of the Plan, or |

| | |
|---|---|
| by the Court. | as soon thereafter as practicable. |
| All trade and service debts and all other obligations incurred in the normal course of business by the Debtor in the conduct and operations of its business during the bankruptcy case. | Paid in full when due in the ordinary course of business or upon such other terms as may be agreed upon between the Debtor and any particular creditor. |
| Claims held by governmental authorities for taxes incurred by the Debtor during the bankruptcy case. | Paid in full when due in the ordinary course of business, in accordance with the normal regulations and policies applicable to such claims outside of bankruptcy. |
| Other administrative expenses | Paid in full on the effective date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | Paid in full on the effective date of the Plan, or as soon thereafter as practicable. |

2.    *Unsecured Priority Claims (Class 2)*

Certain claims, other than tax claims as addressed below, are entitled to priority under § 507(a) of the Code. The Debtor believes that there are no such claims.

3.    *Priority Tax Claims (Class 3)*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment | |
|---|---|---|---|---|
| Real Estate Tax owed to the Marion County Treasurer, Indiana | $324,522.36 | 2nd Installment 2008 and 1st and 2nd Installments 2009 | Monthly payment Beginning 30 days after the Effective Date of the Plan, for a total of 54 months. | =$6,009.67 X 54 months = $324,522.18 |

C.    **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.    *Class of Secured Claims (Class 4)*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The Debtor has one creditor which holds a Secured Claim- Republic Bank.  Republic Bank's claim is secured by the Apartment Complex and proceeds therefrom.  Upon the effective date of the Plan, Republic Bank will be paid in accordance with a Modification Agreement between Republic Bank and the Debtor, which is attached to the Plan as Exhibit A.

2.    *Classes of General Unsecured Claims (Classes 5 and 6)*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.  Section §1122(b) of the Code allows a Debtor to create a convenience class of unsecured creditors, who have claims below a threshold amount or who would be willing to accept the threshold amount in full satisfaction of their claims if they are more than the threshold.  The convenience class may be paid more quickly than the other general unsecured claims.

The following chart identifies the Plan's proposed treatment of Classes 5 and 6, which contain general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 5 | Section 1122(b) Convenience Class of Allowed General Unsecured Claims which are $15,000 or less or which are more than $15,000, but the claimant opts to be a member of the convenience class and accept a payment of $15,000 in full satisfaction of the claim. | Impaired | Class 5 claimants will receive a distribution of 100% of the Allowed amount of their Claims, up to $15,000.00, of which 50% will be paid on or before 15 days after the Effective Date and 50% will be paid on or before 45 days after the Effective Date.  If the holder of an Allowed General Unsecured Claim, in an amount greater than $15,000.00 elects to be a Class 5 convenience class member, any portion of the claimant's Claim over the $15,000.00 cap shall be waived, forfeited and forever barred. |
| 6 | Allowed General Unsecured Claims which are more than $15,000.00 and whose holders do not elect to participate in Class 5. | Impaired | Class 6 claimants will receive a distribution of 100% of the Allowed amount of their Claims in biannual installments of 12.5% each made by the Reorganized Debtor over the course 4 ½ years, with the first installment due 180 days after the Effective Date and each subsequent installment due every 6 months thereafter. |

3.    *Class of Equity Interest Holders (Class 7)*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.  In a partnership, equity interest holders include both general and limited partners.

Class 7 is unimpaired inasmuch as claimants are retaining all of their ownership interst in the Debtor and Reorganized Debtor and in any remaining assets after the Claims of Classes 1 through 6 are paid in accordance with the Plan.  Class 7 is not entitled to any distribution until all of Classes 1 through 6 are paid in full, as provided for in the Plan.

D.    **Means of Implementing the Plan**

The reorganized debtor will use the cash and liquidated assets it holds as of the confirmation date to fund payments due upon confirmation or the effective date of the Plan.  The remaining funds will be retained by the reorganized debtor to be used in the ordinary course of business to maintain the operation of the rental property and/or held by the reorganized debtor to fund the installment payments due 30 after the effective date of the Plan.

The reorganized debtor will continue to receive proceeds of rental income after the effective date of the Plan.  The amount of monthly rental income expected to be earned by the reorganized debtor is approximately $116,000.  This future income will be used to fund all payments due pursuant to the Plan.

E.    **Risk Factors**

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the reorganized Debtor's business plan and the validity of assumptions contained therein.  The Debtor operates in a competitive industry comprised of a large number of landlords and other companies leasing residential housing in the same geographical market. Advertising, price, quality and maintenance of the property and customer service are important aspects of competition, and the competitive environment is often affected by factors beyond management's control, including the unemployment rates and income of prospective renters and what they are able and willing to pay for rent, the  public's perception and trends in neighborhoods and popular geographical areas in which to live, and the increase in rental property available caused by the inability for certain owners to sell real estate in a down market.

It cannot be certain that the Debtor will be able to compete successfully against its competitors in the future or that competition will not have a material adverse effect on the Debtor's operations or earnings.

In addition to the aforementioned risk factors, the business operations and rental revenues of the Debtor may be adversely affected by natural forces, such as tornados, blizzards, inclement weather, earthquakes and other unforeseen natural disasters or events that can impact upon the condition of the rental property or the marketing and sales activities by the Debtor.

F.    **Executory Contracts and Unexpired Leases**

The Exhibit D to this Disclosure Statement lists all executory contracts that the Debtor will reject under the Plan.  All other executory contracts and unexpired leases, including all of the Debtor's

leases with its tenants, will be deemed assumed by the Debtor, pursuant to the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Debtor is not aware of any executory contracts or unexpired leases which are in default or cure amounts due.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are t listed in Exhibit D will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is July 15, 2010.*** Such claims will be treated as prepetition general unsecured claims, either in Class 5 or 6, pursuant to the Plan. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

G.    **Tax Consequences of Plan**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

IV.    **CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 5 and 6 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1, 2, 3, 4, and 7 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case is July 15, 2010.**

### 2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

**Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan.**

4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

B.    **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section [B.2.].

1.    *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.    *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

C.    **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as Exhibit E.

D.    **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.    *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.  Tables showing the projected amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit C.

2.    *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit C.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of $1,422,947.00. Exhibit C is a one year projection of the cash flow for the first year after confirmation. The Debtor believes that cash flow will improve for years 2 through 5, as the Plan payments for Classes 1, 2, and 5 will be completed in the first year.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

## V.    EFFECT OF CONFIRMATION OF PLAN

### A.    DISCHARGE OF DEBTOR

<u>Discharge.</u> On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code. However, the Debtor shall not be discharged from any debt imposed by the Plan. After the effective date of the Plan your claims against the Debtor will be limited to the debts imposed by the Plan.

### B.    Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan. The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

Respectfully submitted on this 18th day of May 2010.

PHEASANT RUN APARTMENTS, L.P.

By:   /s/ David Rasmussen_____
David Rasmussen, as President of Alexander Housing II,
General Partner of the Pheasant Run Apartments, L.P.


STAHL COWEN CROWLEY ADDIS, LLC

By:   /s/ Shelly A. DeRousse_____
       One of its Attorneys

       Scott N. Schreiber
       Shelly A. DeRousse
       Stahl Cowen Crowley Addis, LLC
       55 West Monroe, Suite 1200
       Chicago, Illinois  60603
       (312)641-0060

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| PHEASANT RUN APARTMENTS, L.P., | ) | |
| | ) | Case No. 10-03060-AJM-11 |
| Debtor. | ) | The Honorable Anthony J. Metz III |
| | ) | |

### DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

Pheasant Run Apartments, L.P., as debtor-in-possession, (the "**Debtor**") proposes the following Plan of Reorganization (the "**Plan**"), pursuant to the provisions of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

## ARTICLE I – DEFINITIONS

For the purpose of the Plan, the following terms shall have the meanings set forth below:

1.1 "**Administrative Claim**" shall mean a claim under § 503(b) of the Bankruptcy Code which is entitled to priority under § 507(a)(1) of the Bankruptcy Code.

1.2 An "**Allowed**" Claim shall mean that portion of a Claim which (a) appears on the Debtor's schedules as undisputed, non-contingent, and liquidated or (b) was filed with the Bankruptcy Court as to which no objection has been filed or (c) was filed with the Bankruptcy Court as to which an objection was filed and such objection was overruled or (d) was otherwise allowed by a Bankruptcy Court order.

1.3 "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Southern District of Indiana and any Court having jurisdiction to hear appeals therefrom.



EXHIBIT
A

1.4 "**Bankruptcy Case**" shall mean the above-captioned case commenced by the filing of a voluntary petition by the Debtor seeking relief under Chapter 11 of the Bankruptcy Code.

1.5 "**Claim**" shall mean a claim as defined in § 101(4) of the Bankruptcy Code, including without limitation, claims arising under § 502 of the Bankruptcy Code.

1.6 "**Class**" shall mean a class of holders of claims or interests described in Article III of the Plan.

1.7 "**Confirmation Date**" shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court.

1.8 "**Confirmation Order**" shall mean the order of the Bankruptcy Court pursuant to § 1129 of the Bankruptcy Code confirming the Plan.

1.9 "**Disputed Claim**" shall mean any claim other than an Allowed Claim, which (a) appears on the Debtor's schedules as disputed, contingent, or liquidated or (b) was filed with the Bankruptcy Court as to which an objection has been filed, which objection has not been resolved or determined by a Final Order of the Bankruptcy Court.

1.10 "**Effective Date**" shall mean the date upon which the Confirmation Order becomes a Final Order.

1.11 "**Final Order**" shall mean an order or judgment which has not been stayed and as to which order or judgment the time to appeal or seek review or rehearing has expired and as to which no appeal petition for review or rehearing is pending.

1.12 "**Petition Date**" shall mean the date the Chapter 11 bankruptcy petition was filed in this Bankruptcy Case.

1.13   "**Unsecured Priority Claim**" shall mean a claim other than an Administrative

Claim or a Priority Tax Claim that is entitled to priority under § 507 of the

Bankruptcy Code.

1.14   "**Priority Tax Claim**" shall mean a claim that is entitled to priority pursuant to §

507(a)(B) of the Bankruptcy Code.

1.15   "**Rental Real Property**" shall mean the real property which is a 184 unit

apartment complex located at 7925 Palawaan Drive, Indianapolis, Indiana 46239.

1.16   "**Reorganized Debtor**" shall mean the Debtor, as it operates its business in the

ordinary course of business, after the Effective Date.

1.17   "**Secured Claim**" shall mean a claim held by a creditor secured by a mortgage or

lien on real or personal property owned by the Debtor on the Petition Date, or

upon the leasehold interest and assets of the Debtor in accordance with § 506(a)

of the Bankruptcy Code.

1.18   "**General Unsecured Claim**" shall mean any claim which is not an

Administrative Claim, Unsecured Priority Claim, Priority Tax Claim, or Secured

Claim that arose prior to the Petition Date and includes, without limitation, claims

based upon the pre-petition trade accounts payable or a claim based upon the

rejection of an executory contract pursuant to § 365 of the Bankruptcy Code.

## ARTICLE II- DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

All claims against the Debtor and all interest arising from the ownership a limited

partnership interest in the Debtor shall be bound by the provisions of the Plan and are

hereby designated as the following classes:

2.1     Class 1- shall consist of holders of Allowed Administrative Claims, and the U.S. Trustee fee due pursuant to 28 U.S.C. § 1930.

2.2     Class 2 – shall consist of holders of Allowed Unsecured Priority Claims.

2.3     Class 3 – shall consist of governmental holders of Allowed Priority Tax Claims.

2.4     Class 4 – shall consist of the holder of an Allowed Secured Claim arising out of a mortgage in favor of Republic Bank and Trust recorded against the Rental Real Property.

2.5     Class 5 – shall be a convenience class consisting of the holders of Allowed General Unsecured Claims in an amount of $15,000.00 or less, plus holders of Allowed General Unsecured Claims in an amount greater than $15,000.00 who elect to join the convenience class.

2.6     Class 6 – shall consist of the holders of Allowed General Unsecured Claims in an amount over $15,000.00 who do not elect to join Class 5.

2.7     Class 7 – shall consist of the holders of an ownership interest in the Debtor.

## ARTICLE III - TREATMENT OF CLASSES UNDER THE PLAN

3.1     Class 1- Class 1 Claims are not impaired under this Plan and acceptance of this Plan by holders of such Claims is not required.  Such Claims shall be paid as follows:

    a)     All Allowed Administrative Claims of professionals employed by orders of the Bankruptcy Court shall be paid by the Debtor in full, in cash, on the Confirmation Date or as soon thereafter as practicable.

    b)     All trade and service debts and all other obligations incurred in the normal course of business by the Debtor in the conduct and operation of its

business between the Petition Date and the Confirmation Date shall be deemed Allowed and paid by the Debtor in full when due in the ordinary course of business or upon such other terms as may be agreed upon between the Debtor and any particular creditor. Included in ordinary trade and service debts is the management fees of the Alexander Housing II, Inc., an insider of the Debtor which performed post-petition services for the Debtor and the estate.

c)    All Claims held by governmental authorities for taxes incurred by the Debtor after the Petition Date will be paid on their due dates, in accordance with the normal regulations and policies applicable to such Claims outside of Bankruptcy Court.

c)    All other holders of an Allowed Class 1 Claim will be paid in full on the effective date or as soon thereafter as practicable, as otherwise agreed by such respective Class 1 creditor.

3.2    Class 2 – All holders of Allowed Unsecured Priority Claims shall be paid in full on the Effective Date or as soon thereafter as practicable. The Debtor believes there are no such claims. Class 2 Claims are not impaired under this Plan and acceptance of this Plan by holders of such Claims is not required.

3.3    Class 3- Class 3 consists of Allowed Unsecured Priority Tax Claims of the Marion County Treasurer, Indiana for the pre-petition unpaid Tax liability attributable to the Rental Real Property. According to the Debtor's records, this claim aggregates $324,522.36 and consists of $128,756.87 [final 2008 installment]; $98,883.12 [first installment 2009]; and $97,883.12 [second

installment 2009].  The Reorganized Debtor will repay any and all Unsecured
Priority Tax Claims, in full, in 54 equal monthly installments, with the first
payment due 30 days after the Effective Date, pursuant to 11 U.S.C. §
1129(a)(9)(C).  With respect to the Unsecured Priority Tax Claims owed to the
United States, the claim amount shall include interest at the rate reserved under 26
U.S.C. § 6621.  Class 3 Claims shall be unimpaired under the Plan.

3.4    Class 4- Class 4 consists of the Secured Claim of Republic Bank and Trust
("**Republic**") repayment of which is secured by a mortgage against the Debtor's
Rental Real Property.  During the pendency of the Bankruptcy Case, that is
between the time that this case is commenced and the Plan is confirmed, the
Debtor shall pay Republic according to the Cash Collateral Order entered in this
Bankruptcy Case.  Upon the Effective Date, the Debtor shall pay Republic
according to the terms of the Modification Agreement attached as **Exhibit 1**.

3.5    Class 5- Class 5 is a convenience class of claimants whose Allowed General
Unsecured Claims are $15,000.00 or less each, plus holders of Allowed General
Unsecured Claims in an amount greater than $15,000.00 who elect to join the
convenience class.  The Class 5 claimants will receive a distribution of 100% of
the Allowed amount of their Claims, up to $15,000.00, in two equal installments.
The first 50% of Class 5 claims will be paid on or before 15 days after the
Effective Date and the second 50% of Class 5 claims will be paid on or before 45
days after the Effective Date.  If the holder of an Allowed General Unsecured
Claim in an amount greater than $15,000.00 elects to be a Class 5 convenience

class member, any portion of the claimant's Claim over the $15,000.00 cap shall be waived, forfeited and forever barred. Class 5 is impaired.

3.6    Class 6- Class 6 consists of all Allowed General Unsecured Claims, including all pre-petition penalty claims.  The Class 6 claimants will receive a distribution of 100% of the Allowed amount of their Claims in biannual installments of 12.5% each made by the Reorganized Debtor over the course of 4 ½ years, with the first installment due 180 days after the Effective Date and each subsequent installment due every 6 months thereafter.  The aggregate of estimated Allowed General Unsecured Claims is approximately $245,828.00 as of the Effective Date.  The aggregate amount of each of the installments will be approximately $27,314.22. Class 6 will be paid in full and is unimpaired under the Plan.

3.7    Class 7- Class 7 consists of the partner equity holders of the Debtor.  Class 7 is unimpaired inasmuch as claimants are retaining all of their ownership interest in the Debtor and Reorganized Debtor and in any remaining assets after the Claims of Classes 1 through 7 are paid in accordance with the Plan.

**ARTICLE IV- MEANS FOR EXECUTION OF PLAN**

4.1    The Reorganized Debtor will use the cash and liquidated assets it holds as of the Confirmation Date to fund payments due on the Confirmation and Effective Dates.  The amount of such funds remaining after the payment of claims due on the Confirmation and Effective Dates will be retained by the Reorganized Debtor to be used in the ordinary course of business to maintain the operation of the rental property and/or held by the Reorganized Debtor to fund the installment payments due 30 after the Effective Date pursuant to this Plan.

4.2     The Reorganized Debtor will continue to receive proceeds of rental income from the Rental Real Property after the Effective Date.  The amount of monthly rental income expected to be earned by the Reorganized Debtor is approximately $116,000.  This future income will be used to fund all payments due pursuant to the Plan.

## ARTICLE V – ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS

5.1     The Debtor reserves the right to apply to the Bankruptcy Court at any time prior to the Confirmation Date for authority to assume or reject any and all contracts that are executory, in whole or in part, as provided in §§ 365 and 1123 of the Bankruptcy Code.

5.2     Any contract that is executory, in whole or in part, to which the Debtor is a party and which has not been rejected pursuant to §§ 365 and 1123 of the Bankruptcy pursuant to this Plan or during the pendency of the Bankruptcy Case shall be deemed assumed.

5.3     Upon confirmation of this Plan, the lease dated April 18, 2002 of space for the placement and operation of coin operated commercial laundry equipment, between Debtor, as lessor, and Commercial Coin Laundry Systems d/b/a Crown Coin, as lessee, shall be deemed rejected pursuant to §§ 365 and 1123 of the Bankruptcy Code.

## ARTICLE VI- DISCHARGE

6.1     On the Confirmation Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date,

to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code. The Debtor
will not be discharged from any debt imposed by this Plan.

## ARTICLE VII - GENERAL PROVISIONS

7.1    Modification of the Plan - The Debtor reserves the right, in accordance with the
Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date or
as soon as practicable thereafter. After the Confirmation Date, the Debtor may,
upon order of the Bankruptcy Court, in accordance with § 1127(b) of the
Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies
in the Plan in such manner as may be necessary to carry out the purposes and
intent of the Plan.

## ARTICLE VIII - RETENTION OF JURISDICTION

8.1    The Bankruptcy Court shall retain jurisdiction of the Bankruptcy Case for the
following purposes:

a)    To determine all controversies relating to or concerning the classification,
allowance or satisfaction of Claims;

b)    To determine any and all applications for compensation for professional
and similar fees;

c)    To determine any and all pending applications for the rejection or
assumption and/or assignment, as the case may be, of executory contracts
and unexpired leases to which the Debtor is a party or with respect to
which the Debtor may be liable, and to determine and, if necessary, to
liquidate, any and all Claims arising therefrom;

d)  To determine the nature, extent and validity of all liens on the Debtor's real property;

e)  To determine any and all applications, adversary proceedings, and contested or litigated matters properly before the Bankruptcy Court and pending on the Confirmation Date;

f)  To determine all disputed, contingent or unliquidated Claims;

g)  To modify the Plan pursuant to Article VI or to remedy any defect or omission or reconcile any inconsistencies in the Plan or confirmation order to the extent authorized by the Code;

h)  To make such orders as are necessary or appropriate to carry out the provisions of the Plan.


Dated:  May 18, 2010                    Respectfully Submitted,

                                        PHEASANT RUN APARTMENTS, L.P.

                                        /s/ Shelly A. DeRousse
                                             One of its Attorneys

                                        Scott N. Schreiber
                                        Shelly A. DeRousse
                                        Stahl Cowen Crowley Addis, LLC
                                        55 West Monroe, Suite 1200
                                        Chicago, Illinois  60603
                                        (312) 377-7766

04/07/2010  16:13   847-784-9650                ALEXANDER HOMES                                PAGE   01

Prepared by and Mail to:
STEVEN J. COLOMPOS
REPUBLIC BANK OF CHICAGO
2221 CAMDEN COURT
OAK BROOK, IL 60523

## MODIFICATION AND EXTENSION AGREEMENT

THIS AGREEMENT made as of the 5th day of March, 2010 between REPUBLIC BANK OF CHICAGO, an Illinois banking corporation, (hereinafter called "Bank"), and PHEASANT RUN APARTMENTS, L.P., an Indiana limited partnership, (hereinafter called "Borrower"), WITNESSETH:

THAT WHEREAS, Bank is the owner of that certain Note in the amount of $9,920,000.00 dated March 3, 2008, secured either in whole or in part by a Mortgage recorded March 12, 2008 by the Marrion County Recorder's Office as Document No. 2008-0026526 covering real estate legally described below (herein called the "Property"):

A PART OF THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 12, TOWNSHIP 15 NORTH, RANGE 4 EAST, MARION COUNTY, INDIANA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID QUARTER SECTION; THENCE SOUTH 00 DEGREES 16 MINUTES 00 SECONDS EAST (ASSUMED BEARING) 1766.97 FEET ALONG THE EAST LINE OF SAID SECTION TO THE POINT OF BEGINNING OF THE HEREIN DESCRIBED REAL ESTATE; THENCE CONTINUING SOUTH 00 DEGREES 16 MINUTES 00 SECONDS EAST 868.43 FEET ALONG SAID EAST LINE TO THE SOUTHEAST CORNER OF LAND DESCRIBED IN A WARRANTY DEED TO INDIANA UNIVERSITY FOUNDATION, RECORDED AS INSTRUMENT NO. 1999-0182378 IN THE OFFICE OF THE RECORDER OF MARION COUNTY, INDIANA, ALSO BEING THE NORTHEAST CORNER OF LAND DESCRIBED AS PARCEL 1 IN A WARRANTY DEED TO FRANKLIN VILLAGE, L.L.C. RECORDED AS INSTRUMENT NO. 1997-0166680 IN SAID RECORDER'S OFFICE; THENCE ON AND ALONG THE LINE COMMON TO THE ABOVE SAID TWO PROPERTIES, SOUTH 89 DEGREES 52 MINUTES 58 SECONDS WEST 1262.10 FEET TO THE EASTERLY RIGHT-OF-WAY LINE OF INTERSTATE 465; THENCE ON AND ALONG SAID RIGHT-OF-WAY LINE THE FOLLOWING FOUR (4) COURSES: 1) NORTH 30 DEGREES 35 MINUTES 58 SECONDS EAST 377.06 FEET; 2) NORTH 24 DEGREES 35 MINUTES 01 SECONDS EAST 294.81 FEET; 3) NORTH 20 DEGREES 41 MINUTES 13 SECONDS EAST 206.93 FEET TO THE POINT OF CURVATURE OF A NON-TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A CENTRAL ANGLE OF 01 DEGREE 16 MINUTES 35 SECONDS AND A RADIUS OF 3934.72 FEET; 4) NORTHEASTERLY ON AND ALONG SAID CURVE AN ARC DISTANCE OF 87.66 FEET (SAID ARC BEING SUBTENDED BY A LONG CHORD WHICH BEARS NORTH 22 DEGREES 42 MINUTES 15 SECONDS EAST A DISTANCE OF 87.66 FEET TO THE NORTHEAST CORNER OF SAID INDIANA UNIVERSITY FOUNDATION LAND; THENCE ON THE NORTH LINE THEREOF), NORTH 89 DEGREES 43 MINUTES 59 SECONDS EAST 836.54 TO THE POINT OF BEGINNING, CONTAINING 20.498 ACRES, MORE OR LESS.

COMMON ADDRESS:    7925 PALAWAN WAY
                   INDIANAPOLIS, IN 46239

PIN: 700-7035549

1

EXHIBIT

WHEREAS, the parties hereto wish to modify the terms of the Note, Mortgage and other loan documents executed in conjunction therewith, (collectively called the "**Loan Documents**") by reducing the rate of interest, providing for the payment of interest only for an extended period, the payment of additional interest, and as otherwise set forth herein;

NOW THEREFORE, in consideration of ONE DOLLAR ($1.00), the covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  The base rate of interest charged under the Note shall be reduced to a fixed rate of 4.00% per annum payable monthly, effective as of April 5, 2010. The next monthly payment shall be due May 5, 2010. Monthly payments of interest only shall continue until maturity on March 5, 2013.

2.  As additional interest (and further consideration for the Bank to enter into this agreement), Borrower agrees to pay to the Bank an amount equal to 50% of all Net Sales Proceeds or Net Loan Proceeds as determined below:

    (a)  **Sale of Property.** Borrower shall have the right, but not the obligation (unless so directed by Bank in writing upon receipt of an offer which is for a price in excess of the Loan), to sell the Property to a third party purchaser who is not a Related Party (hereinafter defined) prior to the Maturity Date (hereinafter defined) for a net amount, after paying all ordinary and necessary costs and credits in connection therewith, not less than the outstanding principal and interest then due under the Loan. Upon a sale of the Property, whether voluntary or involuntary and whether before or after the Maturity Date, and in addition to all other amounts due to Bank under the Loan Documents, Second Party shall pay to Bank as additional interest under the Loan fifty percent (50%) of the Net Sales Proceeds from the sale of part or all of the Property (including all related personal property, if any) as additional consideration for Bank entering into this Agreement. For purposes hereof, "Net Sales Proceeds" means the gross sales price of part or all of the Property (including all related personal property, if any) less the following amounts (i) all interest, principal, and other amounts due and owing under the Loan Documents, (ii) customary and reasonable real estate brokerage commissions on such sale payable to other than a Related Party and as approved by the Bank, (iii) customary and reasonable title insurance, escrow, and closing costs and fees, including reasonable attorneys' fees and transfer taxes, payable to other than a Related Party, and (iv) usual and customary prorations with respect to the Property.

    (b)  **Refinance of Property.** If and when Borrower refinances the Loan or obtains a new loan, then in addition to all other amounts due to Bank under the Loan Documents, Borrower shall pay to Bank as additional interest under the Loan fifty percent (50%) of the Net Loan Proceeds of any refinance or other loan or loan increase obtained by Borrower, as additional interest under the Loan as consideration for Bank entering into

the fair market value thereof as determined by Bank in its sole discretion shall be added to the "Residual Value" as determined below.

(ii)    The following terms are defined as follows:

(A)    "Appraisal" means a written narrative appraisal report with no unusual conditions, assumptions, or qualifications prepared by a Qualified Appraiser containing an opinion of the fair market value of the Residual Property as of the date that is thirty (30) days after the Appraisal Process Notice Date, construed without regard to the existence of any lease or contract with a Related Party or any debt or lien, except that the appraiser shall be instructed to reduce his/her opinion of fair market value by the principal balance of the Loan as of the Appraisal Process Notice Date.

(B)    "Qualified Appraiser" means a Member of the Appraisal Institute (MAI), who is, and whose firm is, independent of Borrower and Bank, and who has more than ten (10) years experience as a real estate appraiser in Indiana and more than five (5) years experience appraising commercial real estate within twenty (20) miles of the Property, and has his or her principal office in Indianapolis, Indiana.

(C)    "Related Party" shall mean Borrower, and/or any person or entity directly or indirectly owned by or owning, in whole or in part, Borrower, or any person related to any of the foregoing by birth, marriage or adoption and any trust or entity benefitting, owned by or owning any of the foregoing, or any officer, director, employee, member or agent of any of the foregoing .

(iii)    Borrower and Bank shall each appoint and hire at its own expense a Qualified Appraiser to conduct an Appraisal of the Residual Property and give notice of such appointment and the name, address and qualifications of its appraiser to the other party within fifteen (15) days of the Appraisal Process Notice Date. Borrower and Bank shall each deliver to the other an original copy of the Appraisal prepared by its appointed Qualified Appraiser within forty-five (45) days after the Appraisal Process Notice Date. If one party timely delivers its Appraisal and the other does not, then the valuation stated in such Appraisal as is timely delivered shall be the "Residual Value" for all purposes. If neither party timely delivers the Appraisal it ordered, the aforesaid 45-day period shall be extended by fifteen (15) days. If both parties timely deliver their respective Appraisals and ninety percent (90%) of the valuation stated in the Appraisal stating the higher valuation

4

of the two (the "Higher Value") equals or is less than the valuation stated in the Appraisal stating the lower valuation (the "Lower Value"), then the "Residual Value" for all purposes shall be the average of the Higher Value and the Lower Value (the "Average").

(iv)    If "Residual Value" is not determined as set forth in subparagraph (iii) preceding, then a third Qualified Appraiser (the "Third Appraiser") shall be appointed and the cost of his/her services shall be borne equally by Borrower and Bank.   If Mortgagor and Bank cannot agree on a Third Appraiser, then the first two appraisers shall be instructed to jointly select the Third Appraiser from lists of Qualified Appraisers provided by Borrower and Bank (neither of whom shall provide more than five (5) names), and to do so and give notice thereof to Borrower and Bank within fifteen (15) days after the last applicable date for delivery of Appraisals as provided for in the preceding subparagraph (iii).  The person so selected shall be the Third Appraiser.  If the first two (2) Appraisers fail to timely act or the person so selected fails or refuses to perform his/her duties as set forth herein, then the Chairman of the Board of Directors of the Appraisal Institute (the "Chairman") shall be engaged (by the parties jointly) to select a Qualified Appraiser who will perform such duties as promptly as possible, who shall then be the Third Appraiser.   The Third Appraiser shall be instructed to prepare and deliver to the parties an Appraisal as promptly as possible after the appointment.

(v)    If the valuation stated in the Appraisal prepared by the Third Appraiser (the "Third Value") equals the Average, or is neither more than one hundred two percent (102%) of the Average nor less than ninety-eight percent (98%) of the Average, then the Average shall be the "Residual Value" for all purposes.  If the Residual Value is not determined by the immediately preceding sentence, then if the Third Value is equal to or less than the Lower Value, then the Residual Value for all purposes shall be the average of the Third Value and the Lower Value, or if the Third Value is equal to or greater than the Higher Value, then the Residual Value for all purposes shall be the average of the Third Value and the Higher Value.  If the Residual Value is not determined by the immediately preceding sentences, then the Residual Value shall be the average of the Third Value and the Lower Value, if the ratio of the Third Value to the Lower Value is lower than the ratio of the Higher Value to the Third Value, or if it is not, then the Residual Value for all purposes shall be the average of the Third Value and the Higher Value.

(vi)    Borrower and Bank shall co-operate with one another to timely arrive at a Residual Value as provided for above.  If it is anticipated that the process of determining Residual Value will not

be concluded prior to the Maturity Date, and provided that Borrower has dutifully performed all the obligations, covenants and terms contained in the Loan Documents as modified hereby, and the Loan is not in default, the Bank will agree to extend the Maturity Date for a period of six (6) months so as to permit a determination of Residual Value. It is the intent of this section "Appraisal" and the preceding two (2) sections "Sale of Property" and "Refinance of Property" that Bank shall be entitled to be paid fifty percent (50%) of the excess of the value of the Property over the Loan and, where applicable, certain above enumerated expenses and reimbursements, and these sections shall be applied and interpreted accordingly. In the event the timely determination of the Residual Value is frustrated by a change in appraisal practice or terminology or other cause beyond the control of the parties, and the parties cannot agree on a method to timely arrive at the Residual Value, either party may submit the matter to the Circuit Court of Cook County for the determination of the Residual Value. If the Loan is not repaid in full (including without limitation the payment of 50% of the Residual Value) within four (4) months after the Appraisal Process Notice Date, such date and the notice related thereto and any appraisals conducted pursuant thereto or determinations of Residual Value shall, at the election of Bank, be null and void, and the appraisal process may begin anew. Either party may provide an appraiser with information such party deems relevant, provided that such information is given to all appointed appraisers at the same time and to the other party. Neither party, nor its appraiser, however, shall directly or indirectly provide the Third Appraiser with the Higher Value or the Lower Value.

(d)   Bank shall, at all times while it has a lien on the Property, have the right to approve the sale or refinance of the Property, which approval may be granted or withheld in Bank's sole discretion, but if such sale or refinance shall provide for the repayment in full of the Loan and no Related Party shall be the purchaser or lender thereto, then in such event such approval shall not be unreasonably withheld, conditioned or delayed. In making the computations provided for in the preceding three (3) sections, labeled "Sale of Property," "Refinance of Property," and "Appraisal," no payment, amount or expense shall be counted twice. For example, a payment of 2009 real estate taxes by Borrower that is used to compute Net Loan Proceeds, cannot then be used in a subsequent computation of Net Sales Proceeds, and the balance of the Loan used to compute Residual Value shall not be used to compute Net Loan Proceeds. The right of Bank to the payments provided above in the preceding three (3) sections labeled "Sale of Property," "Refinance of Property" and "Appraisal" are herein sometimes collectively referred to as the "Profits Interest." Notwithstanding the foregoing, in the event that Bank is paid a Profits Interest in connection with a refinance of the Property, such shall fully

6

satisfy Borrower's obligations to pay Bank a Profits Interest hereunder and Bank shall not later be entitled to a Profits Interest in connection with a sale of the Property once Bank's lien interests has been released against the Property. For purposes of clarity, Bank shall be entitled to payment of its Profits Interest only once in connection with either a sale or refinance (which ever occurs first).

3.     The option to assume provisions contained in the Note shall be deleted, unless the Bank, in its sole discretion, agrees to permit a successor purchaser to assume the Loan.

4.     The Maturity Date of the Note shall be extended from March 5, 2011 to March 5, 2013. The option to extend provisions contained in the Note shall be deleted.

Borrower warrants and certifies that the indebtedness evidenced by the Note is a valid and subsisting debt of Borrower and is in all respects free from all defenses, setoffs and counterclaims both in law and equity, as is the lien of the Mortgage.

In all other respects, the Note hereinbefore described and all mortgages, documents and/or instruments securing the same shall remain unchanged and in full force and effect.

Notwithstanding the foregoing, Borrower expressly waives any defenses which it now has or may have or assert. Furthermore, in order to induce Bank to enter into this agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower does hereby release, remise and forever discharge Bank of and from any and all setoffs, claims, counterclaims, demands, causes, causes of action, suits and/or judgments which it now has or may have against Bank including but not limited to matter arising out of the Note and/or any document, instrument or agreement securing the same or arising out of any banking relationship existing between the parties.

      IN WITNESS WHEREOF, this instrument is executed the date and year first above written.

REPUBLIC BANK OF CHICAGO, an
Illinois banking corporation

BY: _____

PHEASANT RUN APARTMENTS, L.P.,
an Indiana limited partnership
BY: ALEXANDER HOUSING II, INC., an
Indiana corporation, its general
partner

BY: _____
      David Rasmussen, its president

7

**EXHIBIT B**

PHEASANT RUN APARTMENTS, L.P.
SCHEDULE OF ASSETS
As of May 18, 2010

| Type of Property | Description | Estimated Current Value |
|---|---|---|
| Real Property | 184 Unit Apartment Complex 7925 Palawaan Drive, Indianapolis, IN | $10,483,000.00 |
| Cash/Bank Accounts | Business Checking Republic Bank | $45,000.00 |
| Furniture | Furniture and Fixtures in Common Areas of Apartment Complex | $12,000.00 |
| | Total: | $10,540,000.00* |

* The Debtor also holds a Tenant Deposit Account at Private Bank and Trust Company with approximately $35,659.00 deposited into it at the time of the filing of the bankruptcy case. The Debtor believes that while it has a security interest in these funds, until the Debtor has the right to own the funds under the respective tenant leases, the funds are not property of the bankruptcy estate.

## Pheasant Run Apts.

## Exhibit C

### 30-day budget

| | 6/1/2010 6/30/2010 | 7/1/2010 7/30/2010 | 8/1/2010 8/30/2010 | 9/1/2010 9/30/2010 | 10/1/2010 10/30/2010 | 11/1/2010 11/30/2010 | 12/1/2010 12/31/2010 | 1/1/2011 1/31/2011 | 2/1/2011 2/28/2011 | 3/1/2011 3/31/2011 | 4/1/2011 4/30/2011 | 5/1/2011 5/31/2011 | ANNUAL AGGREGATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | | | | | | | |
| Cash on Hand | 45,567 | 80,755 | 49,103 | 46,441 | 71,629 | 98,767 | 123,188 | 150,326 | 146,735 | 173,873 | 201,011 | 228,149 | |
| Anticipated Collections in Calendar Month | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 2,807,544 |
| **Cash before Payments** | 161,567 | 196,755 | 165,103 | 162,441 | 187,629 | 214,767 | 239,188 | 266,326 | 262,735 | 289,873 | 317,011 | 344,149 | |
| **Expenses:** | | | | | | | | | | | | | |
| Mgmt. Fees | 3,990 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | |
| Payroll | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | |
| Health Insurance | 790 | 790 | 790 | 790 | 790 | 790 | 790 | 790 | 790 | 790 | 790 | 790 | |
| Court Filings | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | |
| Water & Sewer | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | |
| Electric | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | |
| Advertising | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | |
| Maintenance & Cleaning | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | 12,400 | |
| Leasing Commisions | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | |
| Insurance | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | 1,900 | |
| Legal and professional fees | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| Credit Checks | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | |
| Miscellaneous Expenses | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | |
| Internet & Phone | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | |
| Office Supplies, Postage Printing | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | |
| Office Eqpt. & Computers | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | |
| Storm Water Assessment | - | - | - | - | - | 750 | - | - | - | - | - | 750 | |
| Personal Property Taxes | - | - | - | - | - | 1,967 | - | - | - | - | - | 1,967 | |
| Mortgage Payment (Class 4) | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | 32,667 | |
| Payments to Class 3 creditors (RE Taxes) | - | 45,000 | 6,010 | 6,010 | 6,010 | 6,010 | 6,010 | 6,010 | 6,010 | 6,010 | 6,010 | 6,010 | |
| Real Estate Taxes paid normal course of Business | - | 19,800 | 29,800 | - | - | - | - | 30,729 | - | - | - | 199,600 | |
| Payments to Class 5 Claimants | - | - | - | - | - | - | - | - | - | - | - | - | |
| Payments to Class 6 Claimants | 1,950 | - | - | 1,950 | - | - | - | - | - | - | - | - | |
| Payments to Class 1 Claimants | - | - | - | - | - | - | - | - | - | - | - | - | |
| Payments to Class 2 Claimants | NA | | | | | | | | | | | | |
| Payments to Class 7 Claimants | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Total Outflows** | 80,812 | 147,652 | 118,682 | 90,812 | 88,862 | 91,579 | 88,862 | 119,591 | 88,862 | 88,862 | 88,862 | 291,779 | 1,384,597 |

Aggregate Annual Average Cash Flow: 1,422,947

**EXHIBIT D**

PHEASANT RUN APARTMENTS, L.P.
SCHEDULE OF REJECTED EXECUTORY CONTRACTS
AND UNEXPIRED LEASES

| Counter-party | Date | Executory Contract/ Lease Description |
|---|---|---|
| Commercial Coin Laundry Systems (Lessee) | 4/18/2002 | Lease of space at the Apartment Complex to Lessee for the placement and operation of coin operated commercial laundry equipment. |

## EXHIBIT E

### PHEASANT RUN APARTMENTS, L.P.
### LIQUIDATION ANALYSIS

Available Assets:

| | |
|---|---|
| Cash | $45,000.00 |
| Real Estate (market value, liquidation likely less) | $10,400,000.00 |
| Less Real Estate Tax Lien | ($324,522.36) |
| Less Secured Claim Real Estate | ($9,800,000.00) |
| Less 2% broker commission | ($208,000.00) |
| Less Additional Interest Secured Claim Per Modification Agreement | ($33,738.82) |
| Receivables | $11,700.00 |
| Furniture/Equipment (liquidation value) | $5,000.00 |
| | $95,438.82 |

Less Estimated Fees:

Chapter 7

| | |
|---|---|
| Trustee Fees | $20,000.00 |
| Professional Fees | $10,000.00 |
| Other Liquidation Costs | $2,000.00 |
| Estimated Chapter 7 fees and expenses: | $32,000.00 |

| | |
|---|---|
| Estimated Net Assets Available Before Chapter 11 Claims | $63,438.82 |

Chapter 11

| | |
|---|---|
| Estimated Ordinary Course of BusinessA/P | $50,000.00 |
| Estimated Professional Fees | $60,000.00 |
| Estimated Chapter 11 fees and expenses: | $110,000.00 |

| | |
|---|---|
| Net Loss: | ($36,561.18) |

| | |
|---|---|
| Estimated Amount Available for Distribution to Priority (Other than real estate taxes) and General Unsecured Creditors: | $0.00 |